UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INTUITIVE SURGICAL OPERATIONS,
INC.,	Case No. 2:17-cv-10391

    Plaintiff,	HONORABLE STEPHEN J. MURPHY, III

v.

MIDBROOK, LLC,

    Defendant.
                              /

**OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT [21]
AND GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [22]**

On February 7, 2017, Plaintiff Intuitive Surgical Operations, Inc. ("Intuitive") filed a two-count complaint against Defendant Midbrook, LLC ("Midbrook"). Based upon successor-liability and breach-of-contract theories, Intuitive claimed that Midbrook owed monetary payment and attorney's fees pursuant to a loan agreement. The parties each filed a motion for summary judgment. The Court closely reviewed the briefs and finds that a hearing is unnecessary. For the reasons stated below, the Court will grant in part and deny in part Plaintiff's motion for summary judgment, and grant in part and deny in part Defendant's motion for summary judgment.

**BACKGROUND**

Midbrook, Inc. ("MINC") produced washer products. Intuitive was interested in an ultrasonic medical device washer product. MINC did not have the money to produce it. Intuitive loaned MINC $583,120 pursuant to a loan agreement ("Loan") dated December

1

30, 2013. The loan required MINC to repay Intuitive the full amount plus interest within twelve months.

During 2014, MINC experienced financial hardship. Two banks sought to protect their interests; MINC and the banks stipulated to placing MINC into a receivership. The receiver's responsibilities included marketing and selling MINC's assets and liabilities.

On December 18, 2014, Defendant Midbrook—known as MDBRK at the time—entered into an $872,000 Asset Purchase Agreement ("APA") with the receiver. Midbrook purchased some of MINC's assets, but excluded assets related to MINC's medical division. Midbrook and the receiver completed the deal at a closing the next day.

The APA included provisions related to Midbrook's purchase of assets and assumption of liabilities. Midbrook purchased the following "Business Assets": (1) all of MINC's tangible personal property; (2) $175,000 in cash, other cash equivalents, and receivables; (3) all intangible property used in the Business; (4) certain naming rights; and (5) "all other assets" of MINC "that exist as of the Closing excluding those . . . described in Exhibit J hereto and/or otherwise excluded" by the APA. ECF 21-6, PgID 165–67 (referencing clauses 1.1.1–1.1.3, 1.1.5–1.1.6).[1] The APA thus covered certain tangible personal property, *id.* at 180, and certain intangible business properties, *id.* at 181. The APA's assets provisions excluded certain medical assets associated with a list of products, including the product developed with the money from Intuitive's Loan. *Id.* at 183.

---

[1] The receiver, on behalf of MINC, entered into the APA with MDBRK. After the transaction, MDBRK became Midbrook, LLC—the Defendant in this case. The Court, therefore, will adopt the parties' practice and replace the APA's references to Midbrook, Inc. with "MINC." The Court also will replace "Purchaser" with Defendant Midbrook.

2

Midbrook also assumed liabilities under the APA. First, it assumed all "leases, contracts, agreement, and commitments" related to a postage machine and two Xerox copiers. *Id.* at 166, 182.

Then, Midbrook disclaimed liability for any of MINC's other liabilities "*except* only for" the following set of liabilities:

> 1.3(a)—"those trade payables and other liabilities specifically identified on Exhibit F," and
> 1.3(c)—"any executory obligations of [MINC's] continued performance arising in the ordinary course of business under any contracts and commitments that become performable or payable on or after the Closing Date[.]"

*Id*. at 167. Exhibit F, however, did not identify any specific liabilities. *Id.* at 184.

Under the terms of the Loan, MINC owed payment no later than December 30, 2014. When MINC failed to repay the loan, Intuitive on June 17, 2016 obtained a default judgment against MINC in the United States District Court for the Northern District of California. After receiving the default judgment against MINC, Intuitive sued Midbrook and alleged that Midbrook assumed MINC's payment obligations for the Loan either as a successor to MINC or pursuant to provision 1.3(c) of the APA. The parties filed cross-motions for summary judgment, which the Court addresses now.

## STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" for purposes of summary judgment if proof of that fact would establish or refute an essential element of the cause of action or defense. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). A dispute over material facts is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To show that a fact is, or is not, genuinely disputed, both parties are required to either "cite[] to particular parts of materials in the record" or "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering cross-motions for summary judgment, a court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

**DISCUSSION**

I.  Plaintiff's Motion for Summary Judgment

Plaintiff moved for summary judgment only for its breach-of-contract claim. *See* ECF 21, PgID 139. The Court applies Michigan Law because of the APA's choice-of-law provision. ECF 21-6, PgID 175. *See DP Precise, LLC v. Phoenix Ins. Co.*, No. 13-cv-12397, 2014 WL 12572733, at *4 (E.D. Mich. Mar. 31, 2014).

Contract interpretation seeks "to give effect to the parties' intention at the time they entered into the contract." *Innovation Venture v. Liquid Mfg.*, 499 Mich. 491, 507 (2016) (quotation marks omitted). "Absent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of the written agreement." *Id.* (quoting *Universal Underwriters Ins. Co. v. Kneeland*, 464 Mich. 491, 496 (2001)). Courts

4

examine "the language of the contract according to its plain and ordinary meaning." *Miller-Davis Co. v. Ahrens Const., Inc.*, 495 Mich. 161, 174 (2014).[2]

The examination should consider the contract "as a whole, 'giving harmonious effect, if possible, to each word and phrase.'" *Superior Comm'cns v. City of Riverview*, 881 F.3d 432, 438 (6th Cir. 2018) (citing *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 50 n.11 (2003)). Further, courts "avoid an interpretation that would render any portion of the contract nugatory." *Miller-Davis*, 495 Mich. at 174. Summary judgment is appropriate if the contract is clear and unambiguous. *Superior Comm'cns*, 881 F.3d at 438 (citing *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 473 Mich. 188, 198 (2005)).

Plaintiff contends that a single sentence in the "Liabilities Assumed" section of the APA provides evidence that Midbrook assumed liability for the Loan. Defendant responds that—taken as a whole—the contract precludes Plaintiff's interpretation. Defendant further argues that the Loan is not an executory obligation and is not of MINC's continued performance.

To resolve the dispute, the Court must answer two questions. First, does the APA include liabilities unrelated to the Business? Second, if so, is the Loan a qualifying liability?

    A.    The APA Covers Liabilities Unrelated to the Business.

Both 1.3(c) and the APA as a whole indicate that Midbrook assumed even those liabilities unrelated to the Business.

---

[2] To determine the plain and ordinary meaning of a word, the Court may rely upon a recognized dictionary. *See, e.g., Allstate Ins. Co. v. Freeman*, 432 Mich. 656, 698–99 (1989) (referencing *Black's Law Dictionary* and the *American Heritage Dictionary*).

5

1. *Provision 1.3(c)'s Language*

First, the section identifying Midbrook's assumed liabilities includes expansive language: Midbrook assumes "*any* executory obligations of [MINC's] continued performance arising in the ordinary course of business under *any* contracts and commitments that become performable or payable on or after" December 19, 2014. ECF 21-6, PgID 167 (emphasis added).

The plain and ordinary meaning of "any" in the context of 1.3(c) means "one, some, or all indiscriminately of whatever quantity" or "great, unmeasured or unlimited in amount, quantity, number, . . . or extent[.]" *Any*, Webster's Third New International Dictionary 97 (3d ed. 1961); *see also* Bryan Garner, *Any*, Garner's Modern English Usage 57 (4th ed. 2015) (explaining that, when used in an affirmative sentence, "any" means "every" or "all" and that, in a declarative sentence involving quantity, "any" means "unlimited in amount or extent").

Moreover, 1.3(c) lacks language limiting the scope of the assumed executory obligations related only to the Business.[3] In 1.1.4, the APA limits Midbrook's obligations to those "that pertain to the Business[.]" ECF 21-6, PgID 166. The parties, therefore, employed specific language to constrain terms to the Business when they desired. The absence of that limiting language in 1.3(c) supports the interpretation that the parties

---

[3] The APA states MINC owns the assets used in its "fabricator, washer service, and HOD water bottling equipment and service business, and in its other currently remaining business activities ('the Business')." ECF 21-6, PgID 165. It is unclear whether the "Business" refers to MINC's "currently remaining business activities" or to its "fabricator, washer service, and HOD water bottling equipment and service business." The ambiguity is not material, however, because the parties agree that "Business" did not include MINC's medical division.

intended 1.3(c) to reach a wider range of liabilities—even those liabilities unrelated to the Business.

Further, 1.3(c) states that Midbrook assumed liability for "any executory obligations *arising* in the ordinary course of business *under* any contracts and commitments" that became payable on or after the Closing Date, December 19, 2014. ECF 21-6, PgID 167 (emphasis added). The obligations referenced in 1.3(c) would arise from *any* contracts or commitments. 1.3(c)'s plain language indicates, therefore, that Midbrook assumed any of MINC's contractual obligations that would come due after the Closing Date.

Taken in isolation, 1.3(c) demonstrates that Midbrook assumed liability for an unlimited number of executory obligations arising from an unlimited number of contracts and commitments.

The introductory phrase for Section 1.3 likewise does not limit an expansive interpretation of 1.3(c). Section 1.3's opening line states the general rule that the parties "agree that [Midbrook] assumes no liabilities of [MINC]" and then lists the three exceptions to that rule. If 1.3(c) applied to *any* liability, then that exception would swallow the rule and preclude an expansive interpretation. 1.3(c), however, limits its scope only to "executory obligations" that come due "on or after the Closing Date," which thus prevents 1.3(c)'s exception from swallowing the general no-liabilities-assumed rule contained in the APA.

2. *The Contract as a Whole.*

The entirety of the APA further supports the interpretation that Midbrook assumed liabilities unrelated to the business. Provision 1.3(a) states that Midbrook would assume liability for "those trade payables and other liabilities specifically identified on Exhibit F

7

attached hereto[.]" ECF 21-6, PgID 167. Exhibit F did not list any trade payables or liabilities. If 1.3(a) referred to all the liabilities that Midbrook assumed, then 1.3(a) and Exhibit F would obviate 1.3(c). And courts decline to render contractual provisions meaningless. *See Miller-Davis*, 495 Mich. at 174.

Defendant argues that Exhibit D of the APA specifically lists the contracts Midbrook assumed and that Exhibit D's contracts or commitments are exactly the kind of executory obligations that 1.3(c) references. ECF 22, PgID 213. The argument is unavailing for two reasons. First, 1.1.4 refers only to those "contracts, agreements, and commitments that *pertain to the Business*[.]" ECF 21-6, PgID 166 (emphasis added). Exhibit D, therefore, would obviously not include assumption of the Loan because the Loan is unrelated to the Business. Second, if 1.1.4 and Exhibit D included *all* the assumed executory obligations—as Defendant asserts—then the language in 1.3(c) would be superfluous.

Defendant further avers that "it is clear from the language in the APA that the Receiver and [Midbrook] intended to exclude everything—assets and liabilities—related to [the medical] line of business. To find otherwise would be misinterpreting the contract and the parties' intentions." ECF 22, PgID 215. Defendant relies upon the following language to support its assertion:

> It is the intention of the parties that the Business Assets shall include all the tangible assets that are used in, or are necessary for the operation of, the Business as of the date of the Agreement, which can be sold by the Receiver . . . not including the assets referenced in the Medical Assets letter of intent dated November 21, 2014 and described in Exhibit J hereto.

ECF 21-6, PgID 167.

But the Defendant's conclusion misinterprets the contract language. The cited language specifically refers only to *assets*, not liabilities. The clear language of the APA

8

therefore demonstrates that the receiver and Midbrook intended to exclude all assets related to the medical line of MINC's business—not that the receiver and Midbrook intended to exclude the liabilities associated with MINC's medical line of business.

Moreover, the introductory clause further demonstrates that the language relates only to assets and not liabilities. It states "[t]he Business *Assets* consist of the items described in paragraphs 1.1.1 through 1.1.6[.]" ECF 21-6, PgID 166 (emphasis added). Furthermore, the APA titles the section header in which that language falls as "Purchase and Sale of the Business *Assets*." *Id.* at 165 (emphasis added). Finally, 1.1.4 references liabilities in a specific manner, which minimizes the possibility that the section generally uses "assets" to mean "assets and liabilities."

Based on the language of the disputed provision, 1.3(c), and of the APA as a whole, the contract clearly expresses that Midbrook assumes even executory obligations unrelated to the Business. The Court now takes up the question of whether the Loan is the kind of executory obligation Midbrook assumed.

    B.    The Loan is a Qualifying Executory Obligation.

Whether Midbrook's assumed liabilities under the APA included the Loan depends upon the determination of three questions: First, whether the Loan qualified as an executory obligation. Second, whether the Loan was "of Midbrook's continued performance" "arising in the ordinary course of business." Third, whether the Loan became performable or payable on or after the Closing Date.

    1. *The Loan is an Executory Obligation.*

The APA does not define "executory obligation." The Court must therefore define the term according to its plain and ordinary meaning. "Executory" means taking effect at

9

some future time. *See Executory*, Webster's Third New International Dictionary 795 (3d ed. 1961) (defining "executory" as "designed or of such a nature as to be executed in time to come or to take effect on a future contingency"); *see also Executory*, Black's Law Dictionary 611 (8th ed. 2004) (defining "executory" as "[t]aking full effect at a future time" or "[t]o be performed at a future time; yet to be completed" such as an "executory contract").

Obligation generally means a duty, or something that a person is bound to do or refrain from doing. *See Obligation*, Webster's Third New International Dictionary 1556 (3d ed. 1961) (defining "obligation" as "something that one is bound to do or forbear; a duty arising by contract: a legal liability; "money committed to a particular purpose"); *see also Obligation*, Black's Law Dictionary 1104 (8th ed. 2009) ("a legal or moral duty to do or not do something" that "may refer to anything that a person is bound to do or forbear from doing, whether the duty is imposed by law, contract, [or] promise"; "[a] formal, binding agreement or acknowledgment of a liability to pay a certain amount or to do a certain thing for a particular person or set of persons; esp., a duty arising by contract").

Taken together, then, the phrase "executory obligation" generally means an action that a person is bound to do in the future. Defendant contends that the terms "obligation" and "contract" are interchangeable and that the Court should therefore interpret "executory obligation" as "executory contract," particularly as the bankruptcy law uses the phrase. ECF 22, PgID 217. But the APA does not support the conclusion.

First, Defendant mistakes the part for the whole. Although all contracts are obligations, not all obligations are contracts. Just as all bourbon is whiskey, but not all whiskey is bourbon. *See, e.g., Sazerac Brands, LLC v. Peristyle,* LLC, -- F.3d --, Nos. 17-

5933, 17-5997, 2018 WL 2975995, at *1 (6th Cir. June 14, 2018) (citing *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 414 (6th Cir. 2012)). The word "contract," therefore *may* take the place of "obligation," but it need not do so.

Second, the APA uses the words "contract" and "obligation" separately in other provisions. The APA refers to contracts in two other provisions: one refers to Midbrook's asset purchase of "customer contracts," and the other refers to Midbrook's assumption of "leases, contracts, agreements, and commitments that pertain to the Business" as laid out in Exhibit D. ECF 21-6, PgID 166.

The APA uses the word "obligation" much more frequently and utilizes the term to mean duties arising out of the APA. For example, MINC, the receiver, and the banks agreed to discharge and terminate the liens and security interest in the Business Assets "upon consummation of all obligations of [Midbrook] under this Agreement[.]" *Id.* at 169. *See also id.* at 171 (describing that the parties must perform and comply "in all material respects with all" of their "obligations under this Agreement"); *id.* at 173 (indicating that termination of the Agreement eliminates any "further obligation or liability with respect to this Agreement"); *id.* at 174 (stating that Midbrook "shall have no obligation to hire any of [MINC's] employees"); *id.* (determining the parties shall bear their own costs for "the performance of any related obligations"); and *id.* at 175 (preventing the parties from assigning the Agreement "or any obligation hereto").

The APA's use of "contract" and "obligation" reveal two important features of the parties' intentions. First, the parties distinguished between "contract" and "obligation,"

11

which demonstrates the two terms are not merely interchangeable.[4] Second, the parties use of the word "obligation" in other APA provisions indicates that the parties did not employ "obligation" to mean only a mutual duty of both parties, but also the duty to do or to refrain from doing something for one party.

Most notably, as discussed briefly *supra*, sec. I.A.1, clause 1.3(c) itself uses both the terms "obligations" and "contracts." *See* ECF 21-6, PgID 167 (detailing that Midbrook assumes "any executory obligations . . . arising in the ordinary course of business under any contracts and commitments"). Reading "executory obligations" as "executory contracts" renders the "contracts and commitments" mere surplusage. For example, an executory contract would not include any kind of non-contractual "commitments." Further, substituting "executory contracts" for "executory obligations" would obviate the need to then reference that they arose under a contract or commitment; executory contracts obviously arise under contracts. Inclusion of the "contracts and commitments" clause demonstrates the parties intended to use the expanded sense of duty captured by the word "obligations."

Finally, Defendant's assertion that "executory obligation" means "executory contract" fails for another reason. As Defendant notes, "executory contract" is a term of art with a specific definition. *See* ECF 22, PgID 217. "Executory contract" means "[a] contract that remains wholly unperformed or for which there remains something still to be done on both sides, often as a component of a larger transaction[.]" *Executory contract*,

---

[4] This point is especially true considering that, when interpreting contracts, courts presume that words and phrases have the same meaning throughout the contract, *see United States v. Comm. Health Sys., Inc.*, 666 F. App'x 410, 414 (6th Cir. 2016) (applying the consistent-usage presumption to contract interpretation), and the natural corollary that different words communicate different meanings.

Black's Law Dictionary 344 (8th ed. 2004). If the parties intended to adopt a term of art, they certainly would have employed the more specific language of "executory contract" rather than relying upon the more oblique phrase "executory obligation."

The APA's language, therefore, contemplates that Midbrook would assume any executory obligation, not just any executory contract.

> 2. *The Loan was of Midbrook's Continued Performance Arising in the Ordinary Course of Business.*

Midbrook did not assume all of MINC's executory obligations; it assumed only executory obligations that were "of [MINC's] continued performance arising in the ordinary course of business[.]" ECF 21-6, PgID 167. The Court must determine, therefore, whether the Loan was of MINC's continued performance in the ordinary course of business.

The APA does not define "continued performance" and the Court will supply the phrase its plain and ordinary meaning.[5] In contract law, "performance" ordinarily means "[t]he successful completion of a contractual duty, usu[ally] resulting in the performer's release from any past or future liability[.]" *Performance*, Black's Law Dictionary 1173 (8th ed. 2004). Continued means "stretching out in time or space esp[ecially] without interruption." *Continued*, Webster's Third New International Dictionary 493 (3d ed. 1961).

"Continued performance" means, therefore, a party's remaining duty to successfully complete a contractually required action. So long as one party has not fulfilled a contractual requirement, the party's liability to perform continues. MINC's duty

---

[5] Although "continued performance" carries a specific meaning when a contract has expired but one or both of the parties continue to perform the services expressed in the now-expired contract, the APA did not adopt that term of art. And the parties do not make that argument.

to repay the Loan, therefore, was of its "continued performance" at the time Midbrook and the receiver executed the APA.

Defendant argues, "[t]he Intuitive debt . . . arises from a one-time, lump-sum loan made by a medical customer that is completely unrelated to the entire [Midbrook] transaction and the assets it acquired." ECF 24, PgID 388. The Intuitive debt is arguably not of MINC's continued performance because the debt must be continual in nature, with ongoing payment obligations—not lump sums—that are in the ordinary course of business. *Id.*

MINC's obligation to repay the Loan is certainly continual in nature. The duty remains until MINC repays Intuitive. Nothing in the contract requires MINC to fulfill its duty to repay the Loan in installments, rather than lump sums. Finally, "continued performance" would require performance remaining on both sides *only if* 1.3(c) covered only executory contracts, which it does not. *See, supra*, sec. I.B.1.

Defendant further maintains that the Loan is not of MINC's continued performance because Midbrook assumed particular assets that excluded the medical assets for which the Loan paid. ECF 22, PgID 219–20. But, as already stated, under 1.3(c), Midbrook assumed any executory obligations of MINC's continued performance—even those unrelated to the Business. MINC's repayment of the Loan related to its continued performance under the Loan. Midbrook therefore assumed liability for it.

Finally, the continued performance of the executory obligation must have arisen "in the ordinary course of business." ECF 21-6, PgID 167. Neither party contends that MINC's receipt of a loan to manufacture a particular product for the creditor's use does

14

not arise "in the ordinary course of business." Clearly, the Loan transaction arose during the ordinary course of business.

> 3. *The Loan Indisputably Became Performable or Payable On or After the Closing Date.*

Last, Midbrook assumed only the executory obligations of MINC's continued performance from contracts or commitments if the liability became due on or after the Closing Date. MINC owed payment on the Loan within one year after Intuitive issued the Loan. Intuitive loaned MINC the money on December 30, 2013. The Loan became performable or payable on December 30, 2014. *Compare* ECF 21, PgID 144 *with* ECF 22, PgID 203. The APA's Closing Date was December 19, 2014. December 30, 2014 was after December 19, 2014. The repayment of the Loan, therefore, is the kind of liability that Midbrook assumed under the APA.

C. Fairness of the Contract

Midbrook asserts that finding it liable for the Loan under the APA "would be contrary to laws established to avoid this unconscionable result. In construing a contract, courts must adopt the construction that will result in a reasonable, fair, and just contract as opposed to one that is unusual or extraordinary or produces unfair or unreasonable results." ECF 24, PgID 388.

Midbrook maintains that the Court's interpretation is contrary to law because the construction "produces unfair or unreasonable results." ECF 22, PgID 214. Midbrook asserts "[i]t is illogical and contrary to all business sense to assume more liabilities than necessary" when purchasing assets. *Id.* at 385. Thus, Midbrook concludes, "it would certainly be unusual and extraordinary to hold [Midbrook] liable for a debt related to assets that were sold to a third-party." *Id.* at 388.

The Court is sympathetic to Midbrook's plight, but cannot save it from inartful contract drafting. The Court is "without authority to modify unambiguous contracts or rebalance the contractual equities struck by the contracting parties because fundamental principles of contract law preclude such subjective post hoc judicial determinations of 'reasonableness' as a basis upon which courts may refuse to enforce unambiguous contractual provisions." *Rory v. Continental Ins. Co.*, 473 Mich. 457, 461 (2005). The APA's unambiguous language demonstrates Midbrook assumed repayment of the Loan.

Defendant insufficiently argued its common-law defense of unconscionability. *See Titan Ins. Co. v. Hyten*, 491 Mich. 547, 554–55 (2012) (noting that, in contract law, "common-law defenses may be invoked to avoid enforcement" of the contract).[6] Midbrook neither presents arguments about the parties bargaining powers nor contends that the contract language is substantively unreasonable (just that it is unusual or extraordinary). The Court, therefore, will enforce the unambiguous language of the contract.

D. Breach of Contract

"A party claiming a breach of contract must establish by a preponderance of the evidence (1) that there was a contract, (2) that the other party breached the contract, and (3) that the party asserting breach of contract suffered damages as a result of the breach."

---

[6] Under Michigan law, unconscionability analysis asks two questions: (1) what were the parties' bargaining powers, or relative economic strengths, and (2) is the challenged term substantively reasonable? *Whirlpool Corp. v. Grigoleit Co.*, 713 F.3d 316, 321 (6th Cir. 2013) (citing *Allen v. Mich. Bell Tel.*, 18 Mich. App. 632, 637 (1969). Midbrook likely possessed greater bargaining power considering MINC was in a receivership and in financial distress. Moreover, 1.3(c)'s term is not substantively unreasonable. A party purchasing assets may assume more liabilities than those attached to the assets in order to drive down the purchase price of the assets themselves.

*Miller-Davis Co. v. Ahrens Constr., Inc.*, 296 Mich. App. 56, 71 (2012), *rev'd in part on other grounds*, 495 Mich. 161 (2014).

Here, a contract existed (the Loan), Midbrook breached the contract (after assuming liability for the Loan from MINC), and Intuitive suffered damages (it did not receive repayment). Intuitive therefore established by a preponderance of the evidence that Midbrook breached the Loan.

E. Attorney's Fees

Intuitive seeks attorney's fees for its efforts to enforce the Loan. *See* ECF 21, PgID 149–51. The Court will not consider Intuitive's request for attorney's fees at this time. The Civil Rules require a party to "specify the judgment" and other grounds entitling the movant to an award of attorney's fees. Fed. R. Civ. P. 54(d)(2)(B). Because the Court has not entered judgment in this case, Intuitive's motion is premature.

II. Defendant's Motion for Summary Judgment

Defendant moved for summary judgment on both Plaintiff's successor liability and breach-of-contract claims. The Court will grant summary judgment for Plaintiff on the breach-of-contract claim as discussed *supra*. Plaintiff did not contest Defendant's motion regarding its successor liability claim. The Court, therefore, will grant Defendant's motion for summary judgment on only Plaintiff's successor liability claim.

**ORDER**

**WHEREFORE**, it is hereby **ORDERED** that Plaintiff's motion for summary judgment [21] is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that Defendant's motion for summary judgment [22] is **GRANTED IN PART AND DENIED IN PART**.

The Court will enter judgment separately.

This is a final order and closes the case.

**SO ORDERED**.

s/ Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: June 25, 2018

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 25, 2018, by electronic and/or ordinary mail.

s/ David Parker
Case Manager